The next case on our dock is 23-1248, New Hampshire Insurance Company v. TSG Ski & Golf. Mr. Levin or Levin? It's Levin, Your Honor. Levin. Levin. Yes, Your Honor. Oh, I didn't do very well on that. You may proceed. Thank you, Your Honor. Good morning. May it please the Court, Bradley Levin on behalf of the appellant, TSG. Your Honors, Colorado law is clear. An insurance company's duty to defend is triggered when any allegations in the underlying complaints would impose a liability covered by the policy. As the Supreme Court of Colorado said in the Heckler Mining Company case, the insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusion in the insurance policy. And importantly, they went on to say that an insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insurer. Did the Colorado Supreme Court follow that in Thompson? Your Honor, in terms of the result, the answer is no. I would suggest that, and that's part of the problem here, which is that really the Thompson court really never tackled, really never identified the real issue here, which has to do with when you have allegations and complaints in the complaint which have, don't require, in this case, the knowing falsity requirement, that that's not an element of the claims itself. That really wasn't analyzed. You know, it's interesting. I looked at the CERT grant, and it really doesn't even identify that as a particular issue. And again, recognizing— When the Colorado Supreme Court granted CERT in Thompson, what about the petition for CERT? I don't know. That's interesting. I don't know the petition. There were four questions that they granted CERT on. And like I say, the last question had to do with, as far as the disparagement claim, whether or not that would be covered or not. And it really didn't even identify the knowing of falsity issue. That was something that the Supreme Court dealt with, again, as part of the opinion itself. And I recognize, we recognize, that obviously it's the highest court. It's the Colorado Supreme Court talking. But I think that with respect to this particular issue, it is really difficult to reconcile that aspect of the decision with what the court said in Heflin. Of course, we've got a whole host of other cases, the Compass Case Constitution Associates. They even said it in Thompson. They stated that rule in Thompson. Right. So what are we supposed to do? Thompson is so closely in point, even if they didn't explicitly say, well, we said this a few paragraphs earlier, but we're going to look at the complaint. Right. But they never dealt specifically with one of the issues. It would be better off if the state court could raise this, but I don't know that we can do that. Well, but I think that you can. I think that the point is that the Supreme Court in Thompson never, again, wrestled with the broader issue. Didn't identify and talk about this issue when you have these claims. In this case, we made out there were claims essentially for disparagement, slander of title. When you have these types of claims where knowing a falsity is not an element, it was never part and parcel of anything that needed to be decided, certainly by the jury. I mean, all you do is look at what the jury decided in this case. Right. I mean, if you look at the jury verdict form and what they held, those findings, none of them, the negligence finding, the conspiracy claims and so on, none of them relied on knowing falsity. But isn't the holding in Thompson only possible if you consider the extraneous allegations beyond the specific facts needed to prove the elements of disparagement? Right. So they can't get to the bottom line they get to unless it's implicit within their reasoning that they are looking beyond the elements.  Yeah. And by the way, one of the things that I would, you know, Judge Federico, one of the interesting things is that. That was a tough question. Is what? The way you started off, I didn't think you were recognizing that what he's saying is totally contrary to your position. And it's the big hurdle here. The hurdle being what? That in terms of considering. First of all, you're not supposed to be for purpose of duty to defend. OK. We have to separate out the duty to defend and the duty to indemnify. OK. And so with respect to the duty to defend, you know, it means that if there's any arguable basis whatsoever for finding that there's liability, you have to provide a defense. With respect to the duty to indemnify, as you know, you can consider, as you say, extraneous materials. Now, under Cyprus Amex, and this gets to another error by the court with respect to the duty to indemnify. Under Cyprus Amex, you look, first of all, if you can ferret out based upon the jury verdict form, which is what we have here. If you can ferret out, you know, what it is that the jury found. And, of course, they found liability with respect to these various claims. Again, none of which required anything with respect to knowing falsity. For the court to then proceed and go and look beyond that, to look at, oh, here's what the evidence, and to cherry pick and look at all the evidence that was presented in the trial, was wrongful. Because now Cyprus Amex, of course, and a lot of it becomes pretty nuanced, because the Cyprus Amex case was decided in conjunction with the settlement. OK. And so what you're looking at is the question of, OK, there were monies that were paid out in the settlement. Now the question is whether or not the insurance company has to indemnify for those settlement payments. But here we have a trial, and we have a jury verdict, and we have the verdict form. And unless there's some kind of a surveyed… But even before that, we also have in the complaint where a number of times they allege that the defendants submitted this debt collection letter knowing it to be false. Sure. We have findings that at trial there was testimony from some of the defendants who admitted that they knew that the bottom line dollar figure was likely false, because it didn't match up with what they knew the true up process was ongoing. And then we have Thompson. And all that seems to align. So I guess I'm trying to figure out how it is that we can say, well, Thompson reaches a result that it did, and you can't get to that result unless the lesson from it is that you're considering things like allegations in the complaint and the evidence that are beyond the elements to prove disparagement. So how do we detour from that? So we need to take them both separately. When you were asking your question, it's kind of interesting because you sort of said something about whether it was evidence and findings. So getting to that jury verdict form, it's really, really important. The court should never have strayed into the testimony that was presented at the trial because the fact that the verdict form itself tells you what it is that the jury found. And that is that they found liability on these various claims, none of which require knowing falsity as an element of those claims. Doesn't Cypress-Amex court can do that? No. Actually, what Cypress-Amex says, when I say it was nuanced, it really is very particular. Because what the court says there is that it says the jury verdicts form. Now, remember, this was in the context of a settlement. But the Supreme Court said that a jury verdict form may break out specific claims and the verdict attributable to those claims, which is exactly what happened. And then says if there are various claims and the verdict does not separate them, right, which is not our circumstance. It says then the trial court making the indemnity determination may have to look at the facts presented at trial in that instance. But that's not what happened here. We had a verdict form. It separated them out. We had separate findings from the jury. So there was no need. And in fact, the trial court never should have gone into the various testimony that was presented at trial. But Judge Federico, so that gets in terms of the indemnity. But again, getting back to Thompson, it really does have to do with the conversation we're having with Judge Hartz, which is that I guess we have, you know, I mean, the Supreme Court, we talk about HECLA. We talk about Constitution Associates, COMPAS. I mean, we've got very vigorous case law in the state of Colorado with respect to the duty to defend and if there's any arguable basis and then so on that you need to defend. The idea that somehow, and this is what the insurance companies have said in their response brief, is you don't need to look at all these cases all over the country, right, because we've established the majority of cases all over the country say you don't do that. You don't look to, if you have in terms of assessing the duty to defend, what you don't do is if you have some kind of exclusionary language, but that's not part of the elements of the claim that's being made, you cannot use that in order to vitiate and to say, hey, listen, we don't have to defend anymore. That's the majority rule. And again, you know, the Orlando case from Florida, you know, has a string side. It's got all these cases all over the country. The idea that somehow Colorado is an outlier. Yeah, but we have to apply Colorado law. I understand that, but the point is. So why do we care what they do in Florida? I understand that, but the point is that it really gets back to the very first conversation I was having with Judge Hartz, which is that the Supreme Court in the Thompson case didn't grapple with that issue. There's no place in that decision in which the court deals directly and says, hey, you know, even though you can make out a disparagement claim, that, you know, knowing falsity is not an element of a disparagement claim, and we are at liberty, right, to assess the duty to defend. What we can do is to say, look, you've got this exclusion, and therefore, even though it's not an element of a disparagement claim, because there was knowing falsity, we're going to say there's no defense responsibility. They didn't grapple with this specific issue. They didn't. There's no language whatsoever, if you look at that opinion, where they deal with the issue that we're raising here. I do recognize. They state the proposition of law you're relying on. Right. They do not. I mean, there's no place they actually state that proposition of law. In fact, at the beginning of the opinion, they reference, you know, that there was slander and an infringement-type claim, and what they do is that they say, you know, that those claims are there, but they never really grapple with the issue. They don't lay out the issue. What they do is they conclude in the opinion. Right. They say in the opinion that, hey, you've got – we make out a disparagement claim, but we have these allegations because of what was written in that letter to the commission, to the Jefferson County Commission, because it was something which was contrary to what was in our settlement agreement. Because of that, that it was a knowing conduct on their part. Therefore, the knowing falsity applies. Therefore, there's no duty to defend. And they just reach that conclusion based upon that application. But the specific question that we're talking about right here is not one that they pose in any kind of generalized manner. Let me quote from page 502. Okay. Because they seem to recognize the proposition you're saying. An insurer has a duty to defend where a complaint against its insurer alleges any facts that might fall within the coverage of the policy, even if allegations only potentially or arguably fall within the policy coverage. Sure. They state the rule of law that they're relying on. That's the proposition. And for them to say that and then rule as they did a couple pages later suggests that they know what they were doing. Well, I understand that. But it's not just some talismanic type of statement that you make. You're right. They say that two pages earlier, and then they reach this conclusion. But the specific issue that we're talking about is one that they never identify and deal with. And to answer your question, do I think that it's contrary to what the Heckler case says and all these other Supreme Court cases? At the end of the day, it does. And I think that what this court needs to do is to say, look, you know, we recognize that the proposition we're talking about here, the one that's been recognized by the majority of jurisdictions, still holds. And that proposition is, is that where you're talking about some exclusionary language, which is not an element of the claims that are being pledged, at least some of the claims that are being pledged, you've got a duty to defend. It's that simple. But, Your Honors, and I guess I'll just get to this and give my time for rebuttal. And that is, is that there's a really more – you don't even have to get to this issue. And that has to do with the Herricks, the claims by the Herricks. And I think that it really is, in some sense, a simpler path to get to reversal of the district court opinion. And that is, is that the foundation for the decision not to – that there was knowing falsity, was because of the TRS and their involvement with the true-up process. The Herricks were not involved with the true-up process. So in terms of any kind of knowing falsity, and what I would ask the court to do is to look at paragraph 11 in all the operative complaints. Because what it says is that these defendants claimed that this $15.5 million total was owed by plaintiffs because TRS, Todd Herrick, and Ted Herrick failed to pay any assessments between 2010 and 2015. Now, the knowing falsity was all because they supposedly, you know, avertedly that they knew about TRS's having done the true-up process. But it says nothing, and there's nothing there about the involvement of the Herricks. They were not involved with the true-up process. Weren't they the principal owners? But we're talking about – but with the claim here – How would the company know anything except through somebody associated with the company? But we're not talking about knowledge, per se, because it also has to – the Herricks owned individual units. So the claims that they were making, the claims that they made in the underlying case, was based upon their posture as individual owners of these properties and how they were heard, not as principals of TRS. So the bottom line is, is that to the extent to which the Hendricks – excuse me, the Herricks – had their own separate claims, that the knowing falsity, which only goes to the true-up process and what it is that TRS did, has nothing to do with the claims that were being lodged by the Herricks based upon, you know, this defamation and disparagement and so on arising out of the debt collection letter. So I think that, again, I know, you know, obviously we've got the Thompson issue and so on, but I would ask the court to look very carefully at the issue as far as the duty to defend with respect to the claims by the Herricks, which is separable from those on behalf of TRS. Thank you. Thank you, counsel. Good morning. May it please the court. Aguello Repis on behalf of the insurers, New Hampshire Insurance Company and National Union of Fire Insurance Company of Pittsburgh, PA. The judgment here should be affirmed for one simple reason, because the knowledge of falsity exclusion completely and conclusively bars coverage for all claims asserted in the underlying action. The district court simply applied the provision, the exclusion, exactly as it's written. The court applied it to the allegations of the underlying pleadings as guided by binding Colorado Supreme Court precedent in Thompson and concluded that there is no duty to defend or indemnify the underlying action. And this conclusion, which should be upheld, is dispositive of all other claims in this case. So I'd like to jump straight to the Thompson issue because that's the hot ticket item here. And Mr. Levine's reading of the Thompson case, frankly, is incredibly strained. The court in that case was confronted with the same situation we have here. The underlying complaint didn't say, it wasn't labeled a disparagement claim, but nevertheless, the court looked beyond the labels to the factual allegations and said, hey, yeah, I think the underlying complaint makes out the elements of a disparagement claim. The court looked at the actual elements of the disparagement claim, listed them out, and among those elements was not knowledge of falsity. So it's undisputed that was not an element that the underlying claimants needed to prove their disparagement claim. And even though the claimants didn't need to allege knowledge of falsity, they did. The court said, I'm looking at the underlying complaint. They alleged knowledge of falsity. And that, those allegations, implicated the exclusion, the exact same exclusion we have here. I'm curious, can you think of a principled reason for them to analyze Thompson the way they did in light of the precedent in Colorado and the substantial majority of other jurisdictions that you don't do what they did in Thompson? Is there a reason to distinguish the knowledge of falsity exclusion differently from other exclusions or something? Yeah, I do think that rule makes good sense. I mean, the rule makes sense because the black letter contract law, or insurance law, is you look to the factual allegations. You know, the exclusion is a creature of contract, right? It's not a creature of tort law or contract law. So those elements, tort law or contract law, define the scope of the insurer's liability, right? But that is not the same thing as the contractual obligation to defend or indemnify that liability. Those two things are different things. And so what the court said, essentially, is we're not going to find the elements of the tort dispositive of the contractual duty to defend. We're going to look at the contract, and we're going to see what the exclusion says. And the exclusion says, we're not going to cover this type of liability. But in this case, as in Thompson, the plaintiff could have won on a theory for which there would be no exclusion. They could have won on the ground of negligence or whatever without finding knowledge of falsity. And then you would have the insurer having to pay for its own defense when it's been found liable for something that's not excluded from coverage for duty to defend or indemnify. That's a strange result, isn't it? But that's how the duty to defend works, because the duty to defend is broader than the duty to indemnify. So if the complaint contains allegations that would exclude the potential for coverage, that's it. That's the end of the road. You never even get to the duty to indemnify because there's no duty to indemnify as a matter of law. That is the exclusion that the insurers agreed to. This wasn't hidden. This was in the contract. It was plain. It was clear. They're not claiming it's ambiguous. I didn't know what it means. That's what it means. That's exactly what's going to happen. What would be incongruous is if somehow there were no duty to defend because of the pleadings, but then suddenly a duty to indemnify because the claimants ultimately didn't prove knowledge of falsity. That would be incongruous because it would mean that the duty to indemnify would somehow be broader than the duty to defend. So that doesn't make sense. So I do think the rule in Thompson does make good sense. Perhaps it's an outlier with other states. It doesn't matter. Everyone here agrees. What about the argument based on the specifics of the claims of falsity of knowledge of falsity here? Distinguished between the Herricks and T.A. Telly-Wright. I'm going to call them Telly-Wright because I can't get the letters straight. Thank you. I think that's good. How do you deal with his argument on that issue? So with respect to the Herricks, that is splitting a very fine hair. The fact is, is that the underlying complaints treated Telly-Wright and the Herricks as a collective. The debt collection letter alleged that they were all collectively responsible for this $15.5 million debt. They didn't say, well, you're liable for some and you're, you know, Telly-Wright, you're liable for others. They were treated as a collective. And likewise, the claims were pled similarly. And the Herricks alleged that they have injuries arising from the knowingly false publication of this debt collection letter. Remember, the exclusion uses the causal nexus arising out of. And the Herricks injuries arose out of this knowingly false publication of the debt collection letter. I mean, they say in the complaint, look, we couldn't sell our individual units. We were our other business interests were compromised because of this allegation, this false allegation that was out there. That Telly-Wright, of whom were the principals, by the way, owed $15.5 million for six or seven years of past due assessments that we didn't pay. So they absolutely did allege injuries that arose out of the public knowingly false publication of the debt collection. Can you help me understand, though, why they were treated collectively in the debt collection or the debt notice letter itself? As I recall it, everyone may have contributed to the bottom line, $15.5 million, give or take. But didn't it also show individual assessments that may have been owed and paid? So wasn't it saying individually, here's sort of how it would break down, but then here's the bottom line. So doesn't that, the letter itself, then distinguish between individual persons who may then have contributed to the debt? Well, I believe, if I'm recalling correctly, the debt said it did include like an appendix of like the individual. That's my recollection as well. But the letter itself said, you know, you all are basically responsible. And it wasn't, you know, it was the $15.5 as a collective. And the complaint, if you look at the complaints, the heretics aren't saying like, oh, you know, we owed this amount and Telly-Wright owed that amount. It was, there was no daylight between them. They were all treated as a collective. Let's say just as a matter of argument that we were to disagree and we were to say, well, the heretics are separate. And Mr. Levine said, well, you know, that's your path to just disregard the Thompson issue. It occurs to me, is the exclusion in the policy severable? And that, like, would your duty to defend or indemnify, if we found that you may have had that duty to the heretics, would that then only pertain to the heretics? Or would we have to figure out, you know, what the duties would be from the insurance companies to either defend or indemnify all the plaintiffs together? Are they all lumped together, I guess is what I'm asking. Yeah, I mean, under the duty to defend, if there's any potentially covered claim, then there's a duty to defend. Is it claim or claimant or both? Well, I guess it would be the claimant. I mean, all claims against that claimant. You know, I guess if you're saying that they're separate claimants and they're not being treated as a. Well, that's what I'm asking. I mean, they're saying that we should ride the heretics towards a result where we overturn it because the heretics are different. And I'm trying to understand from your position. I know you say, well, they're not different. They're collective. But even what I'm trying to get at is, is it is it an all or none proposition on both sides of the aisle? I think if you if you go with the assumption that they're being treated basically as two entirely different claimants, then then I think there still would be no duty to defend Telluride. I'm sorry. These would be the Telluride claims, because if that's the assumption and sort of carve those out and then you would just be focused on the heretics claims. And then likewise, I think that would carry over into the duty to indemnify. So then somehow we'd have to parse the liability to the heretics versus the liability to Telluride, assuming that you could do that. But this is hypothetical, rightly. This is that's not how the complaints were pled. That's that's not what the debt collection state. But given if if you assume that, then I think you could carve out still the Telluride claims. Now, to be clear, there not only is the Thompson issue, which says the exclusion still applies, notwithstanding that knowledge of policy is not an element of the particular cause of action at issue. But if you look at the facts here as well, there is no debate that the insurers were alleged and ultimately proven to have circulated that debt collection letter, knowing that that fifteen point five million dollar amount was false. And this is from the allegations of the underlying pleadings. There were multiple iterations, six in all, and the common thread throughout all of the various iterations of the complaint was knowing falsity. And, you know, I want to be clear here. This is not merely the insurers spin on what the allegations said. This is what Telluride and the heretics specifically stated. And I just want to read a couple of examples from the Fifth Amendment complaint. You know, at the time the insurers published the debt collection letter, they knew that the letters calculation of allegedly unpaid assessments was false and misleading. And just to give you one more example, the insurers knowingly circulated a false and misleading debt collection letter in March 2019, which is when the letter was sent. So there's no ambiguity here about what the Telluride and the heretics were alleging. They alleged it plain and clear. And then ultimately at trial, they proved those allegations and they proved it through the insured's own representatives, through their own directors and officers. There was Mr. Brunias, who was a board member, an association board member. He was intimately familiar with the TrueUp process because from 2009 to 2015, he reviewed and approved the budgets by which Telluride fronted these common area expenses. And he reviewed and approved the TrueUp process at the end of the fiscal year by which Telluride's assessments were all offset by those expenses. So he knew precisely that that $15.5 million figure was not true because it didn't account for the setoffs. And to the same effect was the testimony of the other board members who were Mr. Richards and Mr. Jensen. They were also, in addition to being board members, the CFO and CEO of TSG. And they knew as well about the TrueUp process and that that $15.5 million figure did not account, as Mr. Richards said, for a penny of the setoffs that Telluride was entitled to under the TrueUp process. So all these, I just want to be clear on the evidence, whether you consider the allegations, whether you consider the evidence, it all points to the same conclusion. I would like to touch briefly on what Mr. Levine said about Cypress-Amex, the Colorado Supreme Court case, where Mr. Levine represents that a court cannot look at the evidence developed at trial unless it's to clarify the claims, you know, the liability and the verdict. That is not what the court said. The court said you must consider the evidence developed at trial in addition to the judgment. And the court said if there's some ambiguity in the verdict because the claims aren't broken out, yes, you can look to the extrinsic evidence, the facts developed at trial. The court did not say that is the only circumstance in which you can look to the facts developed at trial. So I want to be clear on that point, that the evidence developed at trial, i.e. the testimony of the insured's own directors and officers, does absolutely factor into the analysis here and supports the conclusion that the exclusion applies to completely bar coverage. So to recap, we have the clear allegations of the complaint. We have the trial testimony developed in the underlying trial. We have the Thompson case, which is binding Colorado Supreme Court precedent that addresses this exact issue, and this court is bound to apply sitting in diversity jurisdiction. And those three things together point to the conclusion that the judgment finding that the exclusion applies should be affirmed. And of course, as I said earlier, this conclusion is dispositive of all other claims in the case. And for these reasons, the insurers respectfully request that you affirm the judgment in full. Thank you very much. Thank you, counsel. Case is submitted. Counselor excused.